### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CASE NO.  4:04 CR 465** |
| | ) | |
| **PLAINTIFF** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **JUAN L. HERIOT** | ) | **AND ORDER** |
| | ) | |
| **DEFENDANT** | ) | |

This matter is before the Court upon the Defendant Juan L. Heriot's Motion for New Trial.  See (Dkt. # 54).

### I.     BACKGROUND

The Grand Jury of the United States District Court for the Northern District of Ohio (the "Grand Jury") issued an Indictment on September 14, 2004 charging the Defendant, Juan L. Heriot, with five counts of distributing cocaine base ("crack cocaine") as proscribed by 21 U.S.C. § 841 (a)(1), (b)(1)(B).  See (Dkt. # 1).  The Grand Jury further charged the Defendant as a career offender pursuant to U.S. SENTENCING GUIDELINES MANUAL § 4B1.1 arising from the Defendant's two prior felony convictions for controlled substances offenses.[1]

---

[1]In the wake of Blakely v. Washington, 542 U.S. 296 (2004), the United States Attorney's Office for the Northern District of Ohio adopted a practice of requesting the Grand Jury to charge as specifications certain provisions of the United States Sentencing Commission Guidelines Manual (the "Guidelines" or "USSG").

See (Dkt. # 1).

The Grand Jury issued a Superceding Indictment on February 8, 2005 charging the

Defendant with five counts of distributing cocaine base ("crack cocaine") as proscribed by

21 U.S.C. § 841 (a)(1), (b)(1)(B), and an additional count of assault on a federal employee

as proscribed by 18 U.S.C. § 111.  See (Dkt. # 19).  The Government meanwhile filed an

Information Pursuant to 21 U.S.C. § 851 therein noticing the Defendant's two prior felony

convictions for controlled substance offenses.  See (Dkt. # 21).

The matter proceeded to a trial by jury on Counts 1 through 5.[2]  Jury selection

commenced on September 7, 2005.  The Government opened its proofs by presenting

testimony from the investigating officer – Youngstown Police Department Detective Brian

Simmons ("Simmons").  Simmons testified that he encountered Antwain Slocum ("Slocum")

in late 2003 following Slocum being found in possession of crack cocaine during a drug raid

in Youngstown, Ohio.  See (Tr. of Trial Testimony of Brian Simmons ("Simmons Tr.") at

10).  Simmons arranged for Slocum to serve as a confidential source ("CS") following the

drug raid.  See (Simmons Tr. at 10).

As part of the Slocum's cooperation, Simmons testified that he directed Slocum to

purchase drugs from Brian Williams (aka "B-Bop").  See (Simmons Tr. at 10).  On February

10, 2004, Simmons searched Slocum and Slocum's vehicle, placed an audio recording device

on Slocum's person, provided Slocum with currency to purchase narcotics, and followed

Slocum to a residence located at 328 West Evergreen, Youngstown, Ohio (the "residence").

_____

[2]The Court bifurcated Count Six pursuant to an agreement entered into between the
parties.

-2-

See (Simmons Tr. at 11-12).  Simmons then made a video-recording of Slocum entering and exiting the residence.  See (Simmons Tr. at 13).  Simmons additionally conducted a license plate check of a vehicle (a 1992 Cadillac, green in color) parked outside of the residence. See (Simmons Tr. at 14).  The vehicle was registered to the Defendant.  See (Simmons Tr. at 10).    Simmons concluded the surveillance by following Slocum to a predetermined location where Slocum displayed cocaine base ("crack cocaine") which he claimed to have purchased inside the residence.  See (Simmons Tr. at 16-17).

Simmons directed Slocum to return to the residence on February 26, 2004 for the purpose of purchasing crack cocaine.  See (Simmons Tr. at 24).  Simons again searched Slocum and the vehicle, fitted Slocum with an audio recording device, provided Slocum with currency, and followed him to the residence.  See (Simmons Tr. at 24).   Simmons also ran a license plate check of a vehicle parked outside of the residence – again, the check revealed that the vehicle was owned by the Defendant.  See (Simmons Tr. at 25).  Following his exit from the residence, Slocum displayed crack cocaine to Simmons.  See (Simmons Tr. at 26).

Simmons and Slocum repeated the foregoing procedures on March 5, 2004 and March 10, 2004.[3]  See (Simmons Tr. at 29-30).  On each occasion Slocum presented Simmons with crack cocaine which he claimed to have purchased within the residence.   See (Simmons Tr. at 29-30).

On April 13, 2004, Simmons and Slocum repeated their pre-purchase routine and Slocum entered the residence.  See (Simmons Tr. at 30).  Simmons meanwhile made a video-

---

[3]The vehicle titled to the Defendant was not parked outside of the residence on March 10, 2004.  See (Simmons Tr. at 29).

recording of the area outside of the residence.  <u>See</u> (Simmons Tr. at 32).  Simmons additionally observed the Defendant exit the residence and enter into a vehicle (a 1996 Cadillac, beige/gold in color) bearing the same license plate as that observed during three previous visits to the residence.  <u>See</u> (Simmons Tr. at 32).  Simmons and Slocum again met at their predetermined location and Slocum produced crack cocaine.  <u>See</u> (Simmons Tr. at 32).

On cross-examination, defense counsel targeted the lack of any direct audio or video recorded evidence demonstrating the Defendant's involvement in the drug transactions at issue, as well as Slocum's lack of credibility.  With regard to the latter, defense counsel emphasized that Slocum had not been charged with any crime notwithstanding that state law enforcement personnel had found Slocum in possession of crack cocaine during the late-2003 drug raid.  <u>See</u> (Simmons Tr. at 52).

Slocum thereafter testified as to the events concerning the controlled drug purchases at the residence.  Slocum testified that the Defendant's father, "Rero", lived at the residence. <u>See</u> (Tr. of Trial Testimony of Antwain Slocum ("Slocum Tr.") at 4).  Slocum further testified that he had been convicted of a state felony charge for possession of crack cocaine in 1997 and was present during the drug raid in late 2003.  <u>See</u> (Slocum Tr. at 6).  The Court then interrupted the Government's direct examination and instructed the jury as follows:

> Let me interrupt.  Ladies and gentlemen of the jury, [Assistant United States Attorney] Hernandez has brought to your attention that this witness has had prior felony convictions. These convictions are not material to the issues in this case, but you may consider the fact that he has been convicted – I don't know if I interrupted or if there were more felonies down the road, but he has a couple felony convictions.  You may consider that for the purpose of testing the witness's credibility.

See (Slocum Tr. at 7).

Slocum then testified that he agreed to become a confidential source following the late-2003 drug raid and began to visit the residence to make controlled purchases. See (Slocum Tr. at 7). The Government went on to introduce the audio and video recordings of the controlled purchases into evidence, see (Slocum Tr. at 11, 42), and Slocum explained the circumstances giving rise to the recordings, see (Slocum Tr. at 21-48). Specifically, Slocum testified that he previously purchased crack cocaine from B-Bop at the residence. See (Slocum Tr. at 52). Slocum further testified that he initially attempted to purchase crack cocaine from B-Bop in compliance with Simmons's request; however, B-Bop was unavailable. Nevertheless, the Defendant was present at the residence and sold him crack cocaine on the five occasions charged in the Superceding Indictment. See (Slocum Tr. at 18). Slocum concluded his direct testimony by describing the procedures he and Simmons utilized during each of the five controlled purchases. See (Slocum Tr. at 51-57).

On cross-examination, Slocum testified that he had cooperated with Simmons on a another occasion in an effort to avoid consequences for a prior offense. See (Slocum Tr. at 58). Slocum further testified that he returned to selling drugs and again met with Simmons following the late-2003 drug raid in an effort to avoid a potential eight year sentence for his possession of crack cocaine. See (Slocum Tr. at 58). Slocum testified that he advised Simmons to target B-Bop. See (Slocum Tr. at 61). Slocum additionally admitted to selling drugs from a home down the street from the residence. See (Slocum Tr. at 59). At the close of cross-examination, the Court instructed the jury as follows:

Ladies and gentlemen of the jury, you've just heard through cross-examination

-5-

> by [Assistant Federal Public Defender] Bryan that – and it was brought out by
> counsel for the government, [Assistant United States Attorney] Hernandez,
> through the testimony of Detective Simmons – that in return for the witness's
> cooperation, though he denied saying he was promised anything, but I think
> it's safe to say that he has been promised that he will not be prosecuted for any
> other charges or the fact that Mr. Slocum has dealt drugs in the past.
> And it is permissible for the government to make such promises.  But you
> should consider Mr. Slocum's testimony with regard to whether he may have
> been influenced by the government's promises.  In other words, that goes to
> the credibility of the witness.

See (Slocum Tr. at 87-88).  The Government concluded its case by presenting testimony of

Barbara Copeland, a Youngstown Police Department Officer having responsibility for

evidence/chain of custody, and Barbara DiPietro, a forensic scientist.  The Defendant did not

present any evidence at trial.

The Government commenced its closing argument by identifying Slocum as "the most

important witness in this case."  See (Tr. of Trial Closing Argument ("Tr.") at 2).  The

Government went on to discuss the elements of the offenses and emphasized that "[t]his case

is about whether it was the defendant who sold drugs to Slocum."  See (Tr. at 6).  The

Government concluded its closing argument by discussing the evidence presented at trial.

The Defendant targeted his closing argument "on the credibility of one person, and

one person only, and that's Antwain Slocum, an admitted crack cocaine dealer, admitted drug

dealer, admitted drug defendant, admitted person who is here to gain something in return for

his testimony."  See (Tr. at 18).  After discussing the importance of the presumption of

innocence, the lack of corroboration, and the poor quality of the audio and video recordings,

defense counsel advised the jury:

> You have heard the testimony of Antwain Slocum.  You have also heard that
> this witness may have received consideration from the government related to

the filing of criminal charges and monetary payments in exchange for his cooperation.  It is permissible for the government to make such consideration and payments, but you should consider Antwain Slocum with more caution than the testimony of other witnesses.  Consider whether his testimony may have been influenced by the government's consideration or monetary payments.

Furthermore, Antwain Slocum's prior felony record was brought to your attention only as one way of helping you decide how believable his testimony was.  Do not use it for any other purpose.  It is not evidence of anything else. So here we have the only evidence in the case against Juan Heriot and the case against liberty, against the presumption of innocence for Juan Heriot, is a paid informant, whose testimony is already supposed to be subjected to greater scrutiny.

Ladies and gentlemen, in the most important affairs of your own lives, you wouldn't trust Antwain Slocum when he told you that he had a prior drug conviction?  Ladies and gentlemen, in the most important affairs of your own lives, you wouldn't trust Antwain Slocum when he told you after being convicted of drugs and getting out of it, he went back out and sold more drugs. You wouldn't trust him in the most important of your own affairs.

Ladies and gentlemen, you wouldn't trust Antwain Slocum in the most important of your own affairs if you heard that his testimony was bought and paid for, with consideration of not money, but something far greater, Antwain Slocum testified that he was looking at eight years in jail if he went down for the rap that he was convicted of, he's looking at eight years in jail.

What's eight years of freedom worth to you and me, ladies in gentlemen? What's it worth to Antwain Slocum?  One day of freedom is priceless to me, ladies and gentlemen. I can't imagine what eight years of freedom is worth to you.  I would do anything to say free for eight years, ladies and gentlemen.  If it meant I was going to be taken away from my children, taken away from my wife, I would do anything.  He's in an untenable position himself, ladies and gentlemen.

See (Tr. at 30-34).

Following the closing arguments of counsel on September 8, 2005, the Court instructed the jury.  The jury commenced its deliberations at 2:45 p.m.  See (Dkt. # 44 at 2). At 3:30 p.m., the jury requested to listen to the audio-tapes that were submitted into evidence. See (Dkt. # 44 at 3).  At 5:00 p.m., the Court received notice that the jury desired to retire for the evening.  See (Dkt. # 44 at 3).  Consequently, the Court instructed the jury not to discuss

-7-

the status or nature of the deliberations and discharged the jury.  See (Dkt. # 44 at 4).

The jury re-commenced its deliberations at 9:00 a.m. the following day.  See (Dkt. # 45).  At 1:30 p.m., the Court received a message from the jury enquiring, "Is Juan Heriot also known as DRE, (pronounced Dray)?"  See (Dkt. # 45 at 3).  Upon assembling the Defendant, defense counsel and the Assistant United States Attorney, the Court informally discussed the question and requested the parties to address the matter on the record.[4]  See (Dkt. # 45 at 3).  The Government proceeded as follows:

> [T]he jurors should just be advised that they should rely on the evidence.  The government's concern is that there is testimony and facts on the record that he [the Defendant] is known as DRO which is very similar, arguably, to Dre.  And on the audiotapes, they are to form their own opinions as to what's being heard.  And the government's concern is that what's being referred to as Dro within the audiotapes, maybe they're interpreting as Dre.  And it is their determination as to what decision they are to draw from what's coming out from the tapes.
>
> So there is a concern that there might be confusion as to what Dro and Dre is, based upon what they're interpreting, and as a result, the government's position would be just that standard: You are to rely upon your collective recollection of the evidence that was presented at trial and draw your own conclusions based on that evidence as to whether there is evidence regarding his aliases, would be the proper instruction in this case to the jury.

(Dkt. # 45 at 4.)

Counsel for the Defendant responded: "The jury should be instructed that there was

---

[4]Upon the commencement of jury deliberations, the Court advised the parties of its custom and practice regarding responding to questions submitted by the jury.  The Court advised that it would receive the question, assemble the Defendant, defense counsel and counsel for the Government in the courtroom outside the presence of the jury, discuss the question informally, and thereafter request that the parties place their positions on the record.  The Court then would enter the jury deliberation room accompanied by the court reporter and provide a response to the question.  See (Dkt. # 44 at 2).  The parties consented in this approach.  See (Dkt. # 44 at 3).

-8-

no evidence presented during trial that Juan Heriot was also known as Dre." (Dkt. # 45 at 4.)

The Court considered the matter and adopted the Defendant's suggested answer. Accordingly, the Court advised the jury as follows: "[T]here has not been any evidence presented in this case that Juan Heriot is also known as Dre." (Dkt. # 45 at 5.)

At 3:25 p.m. the Court received another message from the jury enquiring: "If we can not reach a unanimous verdict on one of the five counts, what is the effect on the overall outcome of the trial?" See (Dkt. # 45 at 6.)  Upon re-convening the Defendant, defense counsel and the Government, the Court requested the parties' positions regarding the question.  Defense counsel recommended that the "Court re-instruct the jury on separate counts and that each verdict has to be unanimous as to each count and review that instruction with them." (Dkt. # 45 at 6.)  Defense counsel also expressed the defense's view that it was "premature to give an Allen charge and discharge the jury."[5]  (Dkt. # 45 at 6.) The Government did not object to the Defendant's recommendation, noting: "Maybe just ask them if they want to continue deliberating or break until a later time." (Dkt. # 45 at 6.)  The Court responded, "I'll do that.  What I will do is reread it [the Court's prior instruction regarding consideration of separate counts, see Pattern Criminal Jury Instructions of the District Judges Association of the Sixth Circuit, Instruction No. 2.01A (2005)] verbatim, tell them don't put any emphasis on this particular charge, consider that with the rest of the instructions." (Dkt. # 45 at 6.)

---

[5]The Allen charge refers to the procedures employed by the court when confronting a "deadlocked" jury.  See Allen v. United States, 164 U.S. 492, 501-02 (1896).

Before the Court addressed the jury, defense counsel enquired whether it was "appropriate to tell the jury if you're not unanimous, that that [sic] will result in a hung jury." (Dkt. # 45 at 6.)  The Government objected stating, "That's what the <u>Allen</u> charge is." Defense counsel agreed and the Government suggested that the Court "wait until Monday" to give such a charge.  (Dkt. # 45 at 6-7.)

The parties proceeded to engage in an informal discussion regarding the possibility that the jury had reached partial verdicts.  The Court advised that it was disinclined to accept partial verdicts.  The Court further advised, however, that it would attempt to answer the jury's question by utilizing a portion of the partial verdict pattern instruction and remind the jury of its duty to separately consider each count of the Indictment.

Accordingly, the Court answered the jury's question as follows:

Now, ladies and gentlemen, I'm going to give you further instructions.  By giving these instructions at this time, I do not overemphasize these instructions over the other instructions given to you previously.

You will consider these instructions and all of the other instructions that were given.  And with this understanding, I'll give you this additional law as part of the general instructions of the Court.

Additionally, I will repeat an instruction previously given.  Again, by repeating it, I do not emphasize it over any other part of the instructions.  Of course, if this does not clarify the law for you, you may, in writing, request further explanation.

Ladies and gentlemen, you do not have to reach unanimous agreement on all of the charges before returning a verdict on some of them. If you have reached unanimous agreement on some of the charges, then continue deliberating on the others.

The Defendant has been charged with several crimes.  It is your duty to separately consider the evidence that relates to each charge, and to return a separate verdict for each one, if you can unanimously do so.  For each charge

-10-

you must decide whether the government has presented proof beyond a reasonable doubt that the defendant is guilty of that particular charge. Your decision on one charge, whether it is guilty or not guilty, should not influence your decision on any of the other charges.

(Dkt. # 45 at 8.)

At 4:25 p.m., the jury posed its third question to the Court enquiring: "What do we do with the verdict forms if we are finished deliberating all five counts and unable to reach unanimous agreement on some of the counts?" (Dkt. # 45 at 8.) The Court again convened the parties and discussed potential responses to the question. At the conclusion of these discussions, the Court advised:

We've had a discussion. I'm going to send the jury home and have them return Monday and continue with deliberations.

Counsel and the Court reached an agreement that it's about 4:30 this afternoon. The jury has been deliberating for a day and a half, and I think the best thing to do now is to send the jury home for the weekend, and I will tell them to come back on Monday to continue with their deliberations. All right counsel?

(Dkt. # 45 at 9-10.)

The parties agreed with the Court. However, defense counsel queried: "[A]re we going to seal what they've completed or what they have?" (Dkt. # 45 at 10.) The Court responded: "The verdicts for which they have reached – apparently some of the verdicts have been reached, and I'll have the jurors place those verdicts in a separate envelope, seal it, . . . and we'll retain custody of the verdicts that have already been reached under seal." (Dkt. # 45 at 10.)

The Court advised the jury as follows:

What I'm going to do is, my suggestion is that you go home. You've been

> deliberating for a day and a half, and I think the wise thing to do now is to have you go home this evening, return on Monday, and continue with your deliberations.  I'm going to hand you an envelope. I want you to put those verdict forms for which you have reached unanimous verdicts in this envelope, seal it, and when you're done ring for [the courtroom deputy], hand the envelope to [the courtroom deputy].  We are going to hold it in our vault under seal.

(Dkt. # 45 at 11.)

The jury returned to the Court at 9:00 a.m. on September 12, 2005 and immediately requested to listen to the audiotapes.  See (Dkt. # 46 at 3).  At 10:40 a.m., the jury presented their fourth message to the Court enquiring: "On two counts, we are a hung jury.  What do we do at this point?"  (Dkt. # 46 at 2.)  The Court again assembled the parties and requested suggestions on the manner in which to respond to the jury's question.  See (Dkt. # 46 at 2).  Counsel for the Defendant requested that the Court provide the jury with the Allen charge and order further deliberations.  See (Dkt. # 46 at 2).  The Government stated that it had "nothing to add."  (Dkt. # 46 at 2.)  The Court decided to accept partial verdicts, reasoning:

> Well, this case was relatively short.  The evidence was straightforward.  The jury deliberated about a day and a half last week.  I had received two previous messages indicating that they are having difficulty reaching verdicts on some of the counts, however, they were able to reach verdicts on – we don't know how many, but on a number of counts.  I suggested that the jury place those verdicts upon which they were able to reach a unanimous verdict into a sealed envelope.  It was placed in the custody of the courtroom deputy, and this morning I recommended that the jury return.  And the jury has deliberated approximately an hour and a half this morning.  Deliberations began, continued this morning at 9:00 this morning, and at approximately 10:30 the Court received this last message.

This is the third time that the jury has looked for guidance from the Court.[6]  On

---

[6]This was the fourth time the jury presented a question to the Court and the third occasion where the jury's question indicated that they had reached a unanimous verdicts as to

-12-

all three occasions, it's obvious that the jury is deadlocked on some counts. How many, we don't know, until this morning where it was indicated that they cannot reach verdicts on two of the five counts.

Now, I don't know, of the other counts, whether the jury was able to unanimously agree on prior – we'll find out when I unseal the verdicts. I'm not aware whether they have been able to reach a verdict in any of the other counts this morning, but in any event, I think I've given the jury enough opportunity to deliberate. It was a straightforward case. The issues were not difficult or complex. The evidence was straightforward. I'm aware that the jury made several requests to listen to the audiotapes which were admitted into evidence, and the jury again this morning requested to . . . [l]isten to some of the audiotapes. And it was following that that [sic] the jury sent the message. So I'm not going to give the jury an <u>Allen</u> charge. I'm going to accept the partial verdicts.

(Dkt. # 46 at 3-4.)

The Court then called the jury into the courtroom, repeated the foregoing, and enquired whether the jury was able to reach any verdicts beyond those previously sealed. <u>See</u> (Dkt. # 46 at 5). The foreperson responded in the negative. <u>See</u> (Dkt. # 46 at 5).

The jury returned a verdict of not guilty against the Defendant on Count One of the Indictment. <u>See</u> (Dkt. # 39). The jury further returned a verdict of guilty against the Defendant on Counts Two and Five of the Indictment. <u>See</u> (Dkt. # 40; Dkt. # 41). The jury was unable to return a verdict against the Defendant on Counts Three and Four of the Indictment. At the Defendant's request, the Court polled the jury whereby each juror indicated their assent to the verdicts. <u>See</u> (Dkt. # 46 at 6-7). The Court accepted the verdicts and ordered the same filed. The Court declared a mistrial on Counts Three and Four of the Indictment.

_____

several counts.

On September 20, 2005, the Defendant filed a motion for new trial asserting that a new trial was warranted because the Court accepted and filed a "partial verdict from the jury without first properly instructing the jury on its option to issue a partial verdict or the consequences of doing so."  (Dkt. # 47, Mem. at 1.)  The Defendant contended that the "improper partial verdict instruction unduly interfered with the jury's deliberative process, violating both his Fifth and Sixth Amendment rights and warranting a new trial."  (Dkt. # 47, Mem. at 1.)  Upon consideration of the arguments advanced by the Defendant and the Government, the Court denied the motion.  See (Dkt. # 52).

By letter dated November 22, 2005, counsel for the Government, Assistant United States Attorney Arturo Hernandez ("AUSA Hernandez"), advised defense counsel, Assistant Federal Public Defender Edward Bryan ("AFPD Bryan"), the following:

> [T]he investigating detective in this matter revealed to me prior to trial that Mr. Slocum had previously sold crack cocaine to an individual who unbeknownst to Mr. Slocum was working with law enforcement officers.  It was my understanding at the time of trial that this transaction took place prior to Mr. Slocum agreeing to serve as a confidential informant in the investigation of Juan Heriot and that the transaction pre-dated the transactions that led to Mr. Slocum's cooperation in this case and about which he was cross-examined at trial.    However, I recently learned and confirmed yesterday that my understanding was in error and that the transaction actually occurred on or about April 2005, a date which post dates this investigation and the period in which Mr. Slocum worked as a confidential informant in this matter.  As a result, I made a verbal disclosure to you and am now making this written disclosure as soon as possible after confirming the information so that you may make proper use of the information prior to sentencing if needed.

> As the investigating detective of this case was not involved in the investigation of Mr. Slocum's above-referenced transaction, I am currently not aware of whether Mr. Slocum will be prosecuted for that transaction.  It is my understanding, however, that Mr. Slocum is still not aware that law enforcement knows of that transaction.

-14-

As I also discussed with you today, just prior to trial the investigating agent in this matter learned that a target of a state investigation that was taking place in relative proximity to Mr. Heriot's trial identified Slocum as being involved with providing or "cooking" the crack cocaine found in the possession of this target. At the time of trial, Slocum had not been interviewed regarding those allegations and the information of this informant/target of unknown credibility had not been verified. It should also be noted that the informant/target did not continue to cooperate or provide details regarding his general allegation implicating Slocum. After trial, Slocum was interviewed and I was informed that he did admit that he "cooked" crack cocaine for the informant/target but denied any sale to him. I am not aware of whether Slocum will be prosecuted regarding this incident or whether the matter is proper for prosecution based solely on a defendant's admission since it is apparent that the informant/target is not cooperative.

After identifying that I may have be [sic] in error regarding the timing of the transaction identified in the first paragraph of this letter, I had the investigating detective review the files of other investigative agencies/divisions in the Youngstown area to determine if Slocum had been contacted by law enforcement at any other time after he began serving as a confidential informant in this matter. It was based upon that investigation that the above-referenced details were verified. His investigation also discovered that in January 2005, Mr. Slocum was found in possession of rocks of crack cocaine when he was present during the search of a home in which he was not a target.

(Dkt. # 54, Ex. B attached thereto.)

The instant second motion for new trial ensued.

## II.    LAW AND ANALYSIS

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). When presented with a Rule 33 motion, the district court may weigh the evidence and assess the credibility of the witnesses; "it has often been said that [it] sits as a thirteenth juror." United States v. Solorio, 337 F.3d 580, 589 n.6 (6th Cir. 2003) (internal citations omitted).

-15-

The Defendant advances the present motion pursuant to Rule 33(b)(1) citing the newly-discovered evidence noticed in the Government's November 22, 2005 letter.  To warrant a new trial on the basis of newly-discovered evidence, the Defendant generally must establish: "(1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal." United States v. Jones, 399 F.3d 640, 648 (6th Cir. 2005) (citing United States v. O'Dell, 805 F.2d 637, 640 (6th Cir. 1986)).  However, the defendant's burden is less rigorous where, as here, the new evidence is exculpatory evidence which the Government failed to turn over in violation of the requirements of Brady v. Maryland, 373 U.S. 83 (1963).  See United States v. Frost, 125 F.3d 346, 382 (6th Cir. 1997).  To warrant a new trial arising from a Brady violation, (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the [government], either willfully or inadvertently;" and (3) "prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  Prejudice (or materiality) is established by showing that "there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Strickler, 527 U.S. at 289.  "A reasonable probability is one sufficient to undermine confidence in the outcome." United States v. Phillip, 948 F.2d 241, 249 (6th Cir. 1991) (internal quotation omitted).  Thus, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Strickler, 527 U.S. at

289-90.

The Defendant contends that the three evidentiary items disclosed in the November 22, 2005 letter – namely, (1) the January, 2005 search where Slocum was found to be in possession of controlled substances; (2) Slocum's alleged April, 2005 drug trafficking with a confidential source; and (3) the "cooking" of crack cocaine allegation – were suppressed in violation of <u>Brady</u>.  <u>See</u> (Dkt. # 54 at 3).  The Government concedes that the Slocum's January, 2005 possession of controlled substances, and the April, 2005 alleged drug trafficking offense, were subject to <u>Brady</u>'s disclosure requirements.  <u>See</u> (Dkt. # 63 at 12). The Government nevertheless disputes whether it was required to disclose the information relating to Slocum's "cooking" of crack cocaine.  <u>See</u> (Dkt. # 63 at 12).

As to the first mandate of <u>Brady</u>, there lacks any dispute that the "cooking" allegation is favorable to the Defendant as it may serve to affect Slocumb's credibility.[7]  <u>See</u>  <u>Giglio v. United States</u>, 405 U.S. 150, 153-54 (1972) (extending <u>Brady</u>'s disclosure requirement to evidence affecting the credibility of a witness whose "reliability . . . may . . . be determinative of guilt or innocence").  There likewise lacks any dispute that the Government had this information prior to trial and intentionally withheld it from the defense.  <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995) (finding that the constitutional duty of disclosure attaches regardless of the government's good or bad faith, and regardless of whether the defense requested that evidence or failed to make any request at all).  The Government attempts to

---

[7]As discussed *infra*, the Defendant contends that the three instances revealed in the November 22, 2005 letter are discoverable impeachment material as well as substantive exculpatory evidence.  In light of the Court's ultimate conclusion as to the substantive effect of the three instances, the Court shall address only the impeachment issue at the present time.

justify its decision to suppress asserting "that the information was not subject to disclosure as it was based solely upon the uncorroborated statement of an individual who did not continue to cooperate with the government and as it was information of which Slocum was unaware." (Dkt. # 63 at 14.)  While it is well-settled that the government "has no Brady obligation to 'communicate preliminary, challenged, or speculative information'", United States v. Diaz, 922 F.2d 998, 1006 (2d Cir.1990) (quoting United States v. Agurs, 427 U.S. 97, 109 n. 16 (1976) (citations omitted)), the government maintains an "affirmative duty to resolve doubtful questions in favor of disclosure", Agurs, 427 U.S. at 106.  Indeed, the Assistant United States Attorney has acknowledged that he "probably should have at least informed the Court ex parte" regarding the "cooking" allegation.  The Court concurs in the Assistant United States Attorney's assessment.  There were a number of potential avenues available to comply with Brady, such as an ex parte disclosure or requesting a continuance of the trial to investigate the allegation.  In short, the "cooking" allegation was suppressed in violation of Brady.

The Court's finding that the Government suppressed evidence in violation of Brady does not necessarily compel the conclusion that the Defendant is entitled to a new trial.  As indicated supra, the government violates a defendant's due process rights when it withholds "evidence [that] is material either to guilt or to punishment," Brady, 373 U.S. at 87, and "such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," Strickler, 527 U.S. at 280 (internal quotation marks omitted) ; see also United States v. Jones, 399 F.3d 640, 647 (6th Cir. 2005).  "A 'reasonable probability' is a probability sufficient to undermine

confidence in the outcome." <u>Carter v. Bell</u>, 218 F.3d 501, 681 (6th Cir. 2000) (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985)).

Having the opportunity to assess the Defendant's motion with a first-hand knowledge of the facts and circumstances at trial, this Court finds that there lacks any reasonable probability that the result of the trial would have been different had the Government disclosed the suppressed materials to the Defendant. It is beyond cavil that the three instances disclosed in the November 22, 2005 letter would have served as additional vehicles for impeaching Slocum's testimony. However, the Court finds that newly discovered evidence would not have degraded Slocum's testimony to any degree greater than that already achieved through defense counsel's effective cross-examination and closing argument. As discussed *supra*, the Defendant (as well as the Government) emphasized to the jury the importance of having corroboration for Slocum's testimony. Defense counsel repeatedly referred to the inherently suspect factors giving rise to Slocum's cooperation; namely, Slocum's desire to escape consequences for his most recent drug possession offense. Defense counsel engaged in a constant assault on Slocum's history of drug trafficking by referring to his prior felony conviction(s), his current relationship with an alleged drug supplier known as B-Bop, and his ongoing efforts to sell drugs from an area located near the residence. In short, the newly discovered evidence would add only more of the same to the Defendant's arsenal of impeachment material.

The Defendant counters by characterizing the evidence that Slocum was continuing to traffic in and "cook" crack cocaine during the time he was cooperating with the Government as the "coup de grace" which would have put the case "over the top for Mr.

-19-

Heriot."  The Defendant places particular emphasis on Slocum's prompt return to drug trafficking in 2005 as evidence refuting the presentation of Slocum as a repentant drug trafficker.  Again, the Court finds that the newly discovered evidence would serve the limited purpose echoing the impeachment efforts employed by the Defendant during trial.  Indeed, the Defendant demonstrated at trial that Slocum cooperated with Simmons in the past and immediately returned to drug trafficking.  See (Slocum Tr. at 58).  The newly discovered evidence, therefore, would have little, if any, impact in further impeaching Slocum's testimony.

The Defendant attempts to sidestep this result by advancing two alternative arguments in favor of a new trial.  First, the Defendant acknowledges that the jury was aware of Slocum's inherently suspect testimony and suggests, absent such testimony, that there lacks sufficient evidence to support the convictions on Counts II and V.  As a threshold matter, the Defendant was aware immediately following the trial that Slocum had been effectively impeached, and, therefore, there was an opportunity to raise the motion within the strict time limitations prescribed by Rule 33.  See FED. R. CRIM. P. 33.  Consequently, the Defendant's sufficiency of the evidence argument is untimely as a matter of law.  See United States v. Koehler, 24 F.3d 867, 869 (6th Cir. 1994); United States v. Smith, 331 U.S. 469, 476 (1947) ("It is in the interest of justice that a decision on the propriety of a trial be reached as soon after it has ended as is possible, and that decision be not deferred until the trial's story has taken on the uncertainty and dimness of things long past.").  Assuming *arguendo* that the Court has jurisdiction to consider the sufficiency of the evidence argument, the Court observes that the Defendant conveniently omits from consideration the testimony of

-20-

Simmons and two other witnesses, the audio and video tapes of the controlled purchases, the crack cocaine, the currency utilized to purchase the crack cocaine, and the registrations of the Defendant's vehicle(s), presented into evidence by the Government. As all parties recognize, the jury scrutinized the evidence in search of corroboration for Slocum's testimony and reached verdicts of guilty on two counts, a verdict of not guilty on one count, and no conclusion on the remaining two counts. This Court will not disturb the conclusions reached by the jury following a painstaking and well-reasoned analysis of the evidence. See, e.g., United States v. Sullivan, 431 F.3d 976, 985-86 (6th Cir. 2005) (finding no Brady violation where government became aware of allegedly exculpatory DNA samples post-trial, but conviction nevertheless worthy of confidence in light of other corroborating evidence).

The Defendant next advances the argument that the suppressed evidence was substantive exculpatory evidence – in addition to impeachment material – as the evidence demonstrated that Slocum had access to crack cocaine and independently could have placed this evidence at the residence in an effort to implicate the Defendant. However, there is no Brady violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information." United States v. Cottage, 307 F.3d 494, 499-500 (6th Cir. 2002) (quoting United States v. Clark, 928 F.2d 733, 738 (6th Cir. 1991) (internal citations omitted)). The record plainly indicates that the Defendant repeatedly argued at trial that Slocum could have manufactured the controlled purchases in light of his access to, and familiarity with, drug trafficking. The Defendant continually posed questions relating to procedures employed by Simmons and Slocum in an effort to suggest that Slocum could have carried the crack cocaine into the residence. Indeed, the Defendant

-21-

devoted a significant portion of his closing argument to this theory of the case.  <u>See</u>, <u>e.g.</u>, (Tr.

at 25) ("Antwain Slocum apparently had free access to 328 Evergreen just like anybody else

did.  He could have been in and out of there. . . .Antwain Slocum goes in there, picks up his

stash, he talks about drugs with different people, he comes back out and says, yeah, I just

purchased dope off of Juan Heriot out of 328 Evergreen.").  Accordingly, as the Defendant

presented this theory to the jury at trial, it follows that the newly discovered evidence would

not undermine confidence that the Defendant received a fair trial.

For the foregoing reasons, the Court therefore finds that the evidence noticed in the

November 22, 2005 letter was suppressed in violation of <u>Brady</u>.  The Court further finds,

however, that no prejudice resulted from the Government's improper suppression of the

evidence.  Accordingly, the Defendant Juan L. Heriot's Motion for New Trial, <u>see</u> (Dkt. #

54), is **DENIED**.

This matter shall come before the Court for a sentencing hearing on June 7, 2006 at

9:30 a.m.


**IT IS SO ORDERED**.

<u>**s/ Peter C. Economus - May 5, 2006**</u>
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**